## IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JACKIE DURDEN,** | **CASE NO. 1:15-cv-00118-SHR-GBC** |
| **Plaintiff,** | **(JUDGE RAMBO)** |
| **v.** | **(MAGISTRATE JUDGE COHN)** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,** | **REPORT AND RECOMMENDATION  TO DENY PLAINTIFF'S APPEAL** |
| **Defendant.** | **Docs. 1, 12, 13, 16, 17, 20** |

## REPORT AND RECOMMENDATION

### I.     Procedural Background

On April 16, 2012, Jackie Durden ("Plaintiff") filed as a claimant for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a date last insured of December 31, 2012,[1] and claimed an amended disability onset date of August 26, 2011.  (Administrative Transcript (hereinafter, "Tr."), 13).

After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on August 5, 2013.  (Tr. 52-96).

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

On August 8, 2013, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 32-49).  On August 30, 2013, Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on November 18, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 13-18).

On January 19, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  (Doc. 1).  On March 27, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 12, 13).  On June 9, 2015, Plaintiff filed a brief in support of the appeal.  (Doc. 16 ("Pl. Brief")).  On June 29, 2015, the Court referred this case to the undersigned Magistrate Judge. On July 7, 2015, Defendant filed a brief in response.  (Doc. 17 ("Def. Brief")).  On October 12, 2015, Plaintiff filed a reply brief.  (Tr. 20 ("Reply")).

## II.    Relevant Facts in the Record

### A. Education, Age, and Vocational History

The relevant period begins on August 26, 2011, Plaintiff's alleged onset date, and ends on December 31, 2012, Plaintiff's date last insured. *Supra* note 1. Plaintiff was born in May 1961, and thus was classified by the regulations as a person closely approaching advanced age as of the last insured date of December

31, 2012.  20 C.F.R. § 404.1563(d); (Tr. 47).  Plaintiff graduated high school in 1979 (Tr. 62, 214) and obtained employment with the Pennsylvania Department of Transportation ("DOT").  (Tr. 62, 202, 214).  Plaintiff entered the military in January of 1980 and was discharged in August of 1980.  (Tr. 64, 329).  She reported being discharged after a sexual assault and pelvic pain. (Tr. 64, 329).

Plaintiff returned to work at the DOT in July of 1981 and remained there for almost twenty-five years. (Tr. 202, 329).  She worked in a position classified as a general clerk, a light, semi-skilled position.  (Tr. 46-47, 214).The DOT reported that she took maternity leave in September of 2004 and "never came back." (Tr. 202). She was terminated from employment in March of 2005. (Tr. 202). Plaintiff reported in October of 2011 that "she had quit because she trusted that her child's father would take care of her," but left her child's father when her daughter was one and a half years old.  (Tr. 297-98, 325). She explained that he became abusive after they moved in together and never divorced his first wife. (Tr. 297-98). She indicated in April of 2009 that she was single and lived with her four-year old daughter. (Tr. 818).

Medical records dated April 21, 2009, and June 19, 2010 note that Plaintiff reported working part time at a local newspaper.  (Tr. 682, 781).  She stopped

working at the newspaper in August of 2010.[2] She earned $6,731.98 in 2008, $13,729.50 in 2009, and $9,312.50 in 2010. (Tr. 190, 193). As of May 8, 2012, she was also receiving $743.92 per month in retirement pension from the DOT. (Tr. 250). She received unemployment through May of 2012, when she "had exhausted all of the programs." (Tr. 58-59, 196). In 2011, Plaintiff applied for VA benefits due to physical and mental impairments.  In January of 2012, Plaintiff's child's father was diagnosed with a brain tumor, and he passed away in March of 2012. Plaintiff assumed all the child-care duties. She obtained counsel to apply for Social Security benefits in March of 2012 and applied in April of 2012. Plaintiff testified and reported to medical providers that, on December 12, 2012, the VA awarded her a 70% disability rating. ("70% Rating").

## B.  Relevant Treatment History and Medical Opinions

### 1.  Lebanon VA Medical Center: Andrea N. Raker, Social Worker; Dwight L. Klopp, L.C.S.W.; Ronald S. Johnson, Ph.D.; Robert G. Stephens IV, Ph.D.; Victoria M. Acker, P.A.-C.; Paul Tiger, M.D.; Elizabeth A. Miller. P.A.-C; Shubha R. Acharya, M.D.; Katherine Mulligan, M.D.

In August of 2011, Plaintiff underwent examinations to determine her eligibility for Veterans' (VA) benefits (compensation and pension (C&P)) for pelvic pain, muscle spasms, frequent urination, PTSD, and depression.  (Tr. 331-49).   Plaintiff reported that she left military service after being medically

---

[2] In May of 2012, Plaintiff stated in a work history report that she stopped working at the newspaper in August of 2009. (Tr. 213). In her appeal report, she indicates that she stopped working at the newspaper in August of 2010. (Tr. 268). The August 2010 date corresponds with her earnings record. (Tr. 190).

discharged due to chronic pelvic pain.  (Tr. 347).  Ms. Miller noted a medical record from 1980 where Plaintiff reported constant suprapubic pain, and was admitted to the hospital on September 2, 1980.  (Tr. 347). Examination and diagnostic surgery during that hospitalization indicated normal pelvis and appendix. (Tr. 347).  Upon physical examination Ms. Miller did not note anything abnormal. (Tr. 348). Plaintiff reported she was experiencing multiple subjective symptoms of PTSD "quite a bit" or to an extreme degree. (Tr. 336).  For the Beck Depression Inventory-II, Plaintiff's raw score was 42, which Dr. Stephen stated was consisted with severe depression.  (Tr. 337).

Plaintiff treated with Dr. Johnson, Ms. Acker, and Dr. Tiger from October 9, 2011, through her date last insured in December of 2012. (Tr. 317, 329). She treated with venlafaxine. (Tr. 299, 318). She reported gastrointestinal side effects in November of 2011, but by December of 2011 she was compliant with medication and calmer. (Tr. 299, 318). She discussed her abusive relationship with her child's father/ex-boyfriend and reported problems with weight gain, sleep, flashbacks, irritability, motivation, anger, completing tasks, anxiety, socializing, hobbies, shutting out the world, trust, doing activities for fun, staying home in bed, and frequent nighttime urination that impairs her sleep. (Tr. 298, 314, 317, 318, 329, 475-80). "[Plaintiff] denie[d] problems concentrating, manic symptoms, suicide attempt or ideation, hallucinations, delusions, nightmares, obsessions, or

compulsions." (Tr. 298).  At every session with Dr. Johnson, on October 9, 2011,

October 21, 2011, January 26, 2012, May 7, 2012, June 18, 2012, August 6, 2012,

September 17, 2012, October 11, 2012, November 5, 2012, and throughout

December of 2012, he observed that:

> [Plaintiff] showed no signs of disturbances of thought processes or
> thought content. she showed no signs of perceptual disturbances and
> did not describe any history of same. [H]er expressive and receptive
> communication were intact. Her grooming and hygiene were [within
> normal limits] and indicated appropriate ADL functioning. [S]he was
> dressed appropriately. she was interpersonally appropriate and did not
> show any signs of impulsivity.

(Tr. 305, 310-13, 318, 330, 469, 479-80). At every visit with Ms. Acker, she

observed that Plaintiff:

> [Had] good hygeine, [sic] dressed appropriately for weather and
> situation. Was pleasant and cooperative with interview and
> maintained good eye contact. Pt is alert, calm and Ox3…Speech is
> regular rate, rhythm and volume, spontaneous and goal directed.
> Memory is fair and judgement and insight are [fair]. Denies elusions
> [sic], SI/HI.

(Tr. 299, 319, 466, 476). Ms. Acker observed mild to moderate psychomotor

agitation and depressed and anxious mood during some visits. (Tr. 299, 319, 476).

Dr. Johnson observed depressed mood during some visits. (Tr. 305, 310-12, 465-

64, 469, 474-75, 479-80).

In March of 2012, Plaintiff's ex-boyfriend/child's father died after being

diagnosed with a brain tumor in January of 2012. (Tr. 288-91, 303-10). Plaintiff

reported increased symptoms, including suicide ideation, through May of 2012,

and requested additional anti-anxiety medication and emergency therapy. (Tr. 288-91, 303-10). Plaintiff reported that she was overwhelmed and that there is no one to help with the child-rearing anymore.  (Tr. 306).  She agreed to an increased medication dosage. (Tr. 306-09). Neither Ms. Acker nor Dr. Johnson noted significant differences on mental status examination. (Tr. 305, 307).

On October 24, 2012, Plaintiff stated "I'm actually feeling better and I usually take the clonazepam just once per day." (Tr. 465).  Ms. Acker noted that Plaintiff was tolerating the venlafaxine increase without upset stomach and reported that it helped her mood because she felt less depressed, anxious and overwhelmed.  (Tr. 466).  Plaintiff stated that she was going to the gym routinely and trying to engage more with her child.  (Tr. 466).  Plaintiff reported that she was only taking clonazepam once on most days as didn't need a second dose, to which Ms. Acker told her it was fine not to take a second dose.  (Tr. 466).

On November 5, 2012, Dr. Johnson noted that Plaintiff was "doing reasonably well." (Tr. 465). Plaintiff began weekly "Prolonged Exposure" ("PE") therapy.[3]  (Tr. 460-64). On December 14, 2012 and December 21, 2012, Plaintiff's mood and affect were normal and she denied suicidal ideation. (Tr. 449, 460).

---

[3] Prolonged Exposure Therapy employs repeated exposure to thoughts, feelings and situations that the patient has been avoiding helping one to learn that reminders of the trauma do not have to be avoided.  *See e.g.*, Bethany C. Wangelin, Peter W. Tuerk, *PTSD in Active Combat Soldiers: To Treat or Not to Treat*, 42 J.L. Med. & Ethics 161, 162 (2014); *In re Autumn F.*, No. K09-CP09-011836-A, 2013 WL 2132091, at *11 (Conn. Super. Ct. Apr. 25, 2013).

## 2. Lebanon VA Medical Center Opinion Evidence

On August 26, 2011, Dr. Stephens completed an examining source[4] medical opinion. Dr. Stephens opined that Plaintiff's GAF[5] scores were "consistent with serious impairment in social and occupational functioning." (Tr. 333). Dr. Stephen indicated that Plaintiff has "[o]ccupational and social impairment with deficiencies in most areas such as work, school, family relations, judgment, thinking and/or mood." (Tr. 334). Dr. Stephens indicated that the duration of Plaintiff's abovementioned symptoms were more than one month and "cause clinically significant distress or impairment in social, occupational, or other important areas of functioning." (Tr. 341). Dr. Stephens also indicated that Plaintiff: 1) experienced disturbances of motivation and mood; 2) had difficulty in establishing and maintaining effective work and social relationships; 3) had difficulty in

---

[4] The evaluation was "for disability evaluation, not for treatment purposes." (Tr. 331-32).

[5] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. . . . . A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*").

adapting to stressful circumstances, including work or a work-like setting; 4) had an intermittent inability to perform activities of daily living, including maintenance of minimal personal hygiene; and, 5) was capable of managing her financial affairs. (Tr. 342). Dr. Stephen opined:

> Based on information derived from a clinical interview, records review, and administered psychometric assessment tools, it is my clinical opinion that the Veteran meets DSM-IV-TR diagnostic criteria for PostTraumatic Stress Disorder . . . . Further, it is my opinion that the Veteran's symptoms are causing serious impairment in her psychosocial functioning and resultant quality of life. The opinion rendered above is based on expertise in the assessment and treatment of trauma.

(Tr. 342-43).

Throughout the relevant period, Dr. Johnson assigned Plaintiff GAF scores that ranged from 45 to 48. (Tr. 305, 311-13, 318, 331, 449, 460-63, 469, 479). Ms. Acker assigned her GAF scores that ranged from 40 to 50 (Tr. 299, 319, 466).

On February 27, 2012, Dr. Johnson wrote a letter indicating that he had treated Plaintiff since October 21, 2011; she was diagnosed with PTSD, and had a GAF score of 47. (Tr. 312, 679). Dr. Johnson opined that Plaintiff's "symptoms are in the severe range making is very difficult, if not impossible to maintain employment at this time." (Tr. 312, 679).

On December 31, 2012, Dr. Stephens completed a PTSD disability benefits questionnaire which was not based on examination of Plaintiff, rather based on review of his last assessment and subsequent treatment notes. (Tr. 449-58). Dr.

Stephens reviewed his August 2011 assessment and treatment notes since then and

opined that the August 2011 assessment still reflects that Plaintiff's symptoms

"remained in severe range" and Dr. Stephens checked the same boxes indicating

Plaintiff's level of function as was indicated in the August 2011 assessment.  (Tr.

452-57).   Dr. Stephen concluded:

> At the time of that assessment, the Veteran was not found to be unable
> to secure and maintain substantially gainful employment as a result of
> the symptoms associated with her diagnosis of PTSD. Based on a
> review of clinical notes in the VA electronic medical record since the
> time of examination, I see no reason to alter the opinion rendered on
> 8/26/11.

(Tr. 458).

### 3. Consultative Agency Opinion of Roger Fretz, Ph.D.

On June 11, 2012, Dr. Fretz reviewed Plaintiff's medical records through

June of 2012 from the Lebanon VA Medical Center and from the Lebanon Free

Clinic, along with Plaintiff's function report, and work history.  (Tr. 98). He noted

that Plaintiff was diagnosed with Major Depressive Disorder and PTSD and had

been in outpatient psychological treatment since October 2011.   (Tr. 100).   Dr.

Fretz observed that the "treatment notes manifest no evidence of a thought

disorder, no evidence of severe dysfunction in any area," "[s]he is capable of self-

care/hygiene," "[s]he is able to perform ADLs, able to drive, [and] shop." (Tr.

100).  Dr. Fretz noted that although Plaintiff "describes some isolative behavior,"

she is able "to engage in social settings, [has] no legal difficulties, [and] no

[substance abuse] issues." (Tr. 100).   Dr. Fretz also observed that although Plaintiff described some difficulty with concentration, there is no evidence "supporting significant compromise in this area." (Tr. 100).  Dr. Fretz opined that Plaintiff had no problems with adaptation or memory.  (Tr. 100).

### 4. Good Samaritan Hospital

Plaintiff treated at Good Samaritan Hospital on April 21, 2009; June 19, 2010; January 31; 2011; March 26, 2011; and March 1, 2012 for various impairments. (Tr. 682, 739-40, 755, 764-66, 781).   Treatment records indicated normal gait, mood, speech, and thought process. (Tr. 739-40, 766). In January of 2011, prior to the onset date, Plaintiff reported intermittent mild headaches and vertigo that had been relieved with medication a year ago. (Tr. 764-65).

### 5. Lebanon Free Clinic: Barton C. Hughes, M.D.; Sergei L. Joffy, M.D.; B. Bollinga, R.N.

Prior to the relevant period, between December 2010 and March 2011, Plaintiff presented for treatment for high blood pressure, asthma, having to use the bathroom "all of the time," vertigo, and a continuous high pitch sound in her ears. (Tr. 352-55). On March 18, 2011, Plaintiff reported feeling much better.  (Tr. 355). Through August of 2011, Plaintiff reported "feeling well" except for occasional sinus, sore throat, fever, and pharyngitis. (Tr. 355-57).

During the relevant period, Plaintiff reported experiencing vertigo two weeks earlier in September of 2011, indicated on May 8, 2012 that her vertigo

occurred vertigo periodically, usually once per week, and reported an increase in vertigo later in May of 2012. (Tr. 358-62). She also reported a flare of irritable bowel syndrome due to her child's father's death. *Id.* Plaintiff had reported nocturnal urinary frequency in October of 2011, February of 2012, March of 2012, and April of 2012. *Id.* Records note her hypertension was controlled. *Id.* Plaintiff reported increased stress in March of 2012 and was tearful in April of 2012 due to the death of her child's father. (Tr. 361-62). Plaintiff sought treatment for cold symptoms in March and April of 2012, which had resolved by May 8, 2012. (Tr. 361-62). Plaintiff reported not having any shortness of breath, chest pain, nausea, or vomiting and has not had any recent angioedema flare-ups. (Tr. 362). Plaintiff reported rarely needing medication to treat her asthma. (Tr. 362). Plaintiff treated for left arm symptoms, leg symptoms, a headache, molar pressure, and acid reflux in August of 2012. (Tr. 409). Plaintiff treated for rectal bleeding in October of 2012 and reported increased stress in November of 2012. (Tr. 406-08).

### 6. GS Digestive Health Specialists: Robert R. Schade, M.D.

Plaintiff treated from October to December of 2012. (Tr. 426-28). She reported blood in her stool, but little or no pain, and was diagnosed with hemorrhoids. Id. She declined additional treatment due to the cost. *Id.* In December of 2012, Dr. Schade noted that Plaintiff currently had no symptoms. *Id.* Plaintiff denied hearing changes or pain in her ears, denied current abdominal pain,

bleeding, heartburn, nausea, vomiting, dizziness, headaches, chest pain, lightheadedness, palpitations, arthralgia, stiffness, and swelling. *Id*. Dr. Schade noted normal gait, extremities, sensory and motor function, and strength. *Id.*

### 7. Medical Treatment after Date of Last Insured

With regard to evidence reflecting treatment after the expiration of Plaintiff's last date of insured, the records reflect continued stabilization and improvement in her mental and physical symptoms.

Plaintiff reported varying levels of subjective symptoms. (Tr. 444-46, 498, 511-12, 557-58, 566, 590) Dr. Johnson's examinations remained essentially unchanged. (Tr. 444, 511-12, 564-65, 639). Ms. Acker's mental status examination remained essentially unchanged. *Compare* (Tr. 446, 499, 558, 566) *with* (Tr. 299, 466, 476). She reported PE therapy increased her symptoms. (Tr. 445). Plaintiff reported that she was tolerating the venlafaxine and felt that it helped with her depression, anxiety, and feeling overwhelmed. (Tr. 445). Plaintiff reported that the medication works well but made her drowsy. (Tr. 566). Plaintiff reported that she was approved at 70% service connection disability for PTSD and this has lifted much of the financial burden for her and she is very happy to be able to provide for her child. (Tr. 445-46). Ms. Acker and Dr. Johnson continued to assess GAF scores between 45 and 56. (Tr. 444-45, 500, 512, 565, 610). Dr. Johnson continued

to note that Plaintiff was stable and functioning appropriately in her activities of daily living. (Tr. 499-500, 511-12, 564-65, 610, 639).

On April 3, 2013, Plaintiff reported a recent GI illness and vertigo. (Tr. 566). She was subsequently diagnosed with colitis, but on June 30, 2013, Plaintiff denied experiencing any abdominal pain, nausea, diarrhea, or vomiting.  (Tr. 623, 640). On July 12, 2013, the symptoms of Plaintiffs colitis appeared to be in abeyance. (Tr. 613). On May 15, 2013, Plaintiff underwent a physical C&P examination by Dr. Mulligan.  (Tr. 513-557).  Dr. Mulligan opined that Plaintiff's respiratory condition did not impact her ability to work (Tr. 529) and that Plaintiff's urinary incontinence did not impact her ability to work (Tr. 539).

## C. Function Report and Testimony

In a function report dated May 17, 2012, Plaintiff reported that she suffered from "extreme depression" and vertigo. (Tr. 232).   Plaintiff states that the medication rendered her "immobile" as she was completing the function report. (Tr. 232, 240, 242).  Plaintiff reported that her COPD makes her tire quickly and that she needs an epi-pen for angioedema which can knock her off of her feet for weeks at time.  (Tr. 232-33).  Plaintiff reported that when she was working, her impairments "severely hindered [her] attendance" and her ability to perform a regular work day.  (Tr. 233).  Plaintiff reported that she is no longer able to "live life, workout, long walks, luncheons," and spend time with family without being

"knocked by vertigo."  (Tr. 234).  Plaintiff reported that she no longer has an appetite and when she experiences vertigo, it "put's [her] down" for weeks at a time.  (Tr. 234).  Plaintiff reported that anxiety and nocturia interferes with her ability to sleep through the night.  (Tr. 234).  Plaintiff reported that now she wears only sweatpants and shirts and only wears her hair in a ponytail.  (Tr. 234).  Plaintiff reported that she needs reminders to refill her medication and sometimes forgets if she had taken her medication.  (Tr. 235).

Plaintiff reported performing some household chores, but it takes her a month to get to cleaning and doing laundry.  (Tr. 235).  Plaintiff reported that when she is not sleeping, she watches television.  (Tr. 237).  Plaintiff stated that she did not have the energy to do outside work and that such exertion triggers COPD symptoms.  (Tr. 235-36).  Plaintiff reported that she only goes outside to take her child to and from school and due to her depression and anxiety it is difficult to deal with life and people.  (Tr. 236).  Plaintiff reported that she can drive but does not own a car and uses public transportation.  (Tr. 236).  Plaintiff reported that she does not do any shopping.  (Tr. 236).  Plaintiff reported that her COPD, vertigo, depression and anxiety limits her ability to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, follow instructions, get along with others, and to remember.  (Tr. 238, 241).  Plaintiff stated that she could only walk five minutes before she would need to stop and rest until she has counted to thirty.

(Tr. 238).   Plaintiff reported that she could only pay attention for less than five minutes, could not follow written or spoken instructions well.  (Tr. 238).

On August 5, 2013, Plaintiff testified at a hearing before the ALJ.  (Tr. 52-96).  Plaintiff testified that she received unemployment benefits until May of 2012 and that in order to receive unemployment benefits; she contacted the agency every two weeks.  (Tr. 58-59).  Plaintiff affirmed that she stated to the unemployment agency that she was available to work while receiving benefits and that she considered that she would be able to work in customer service up through May 2012.  (Tr. 59).  Plaintiff explained:

> . . . for me and to me both of them were my truth at that time. I was brought up to do what you have to do in order to maintain your independence, which for me of course is working. But it was a battle every single solitary day to get up out of bed, to go in and do a job, to maintain work, to maintain my independence. And that was . . . my truth.

(Tr. 60). Plaintiff reiterated the limitations she claimed in the function report with depression, socializing, concentrating, suicidal ideation, medication that "knocks" her out, and anxiety. (Tr. 72, 79-80, 82-84). Plaintiff testified that since her onset date that she has frequently thought of hurting herself.  (Tr. 82).  Plaintiff testified that there are some times where she goes without bathing for up to three days.  (Tr. 82).  Plaintiff estimated that her symptoms would cause her to miss work two days every two weeks.  (Tr. 81).

The ALJ identified the normal observations by Dr. Johnson. (Tr. 73). Plaintiff disagreed with these observations, detailing "I tell him how I'm feeling . . . . how I feel like I'm neglecting my child because I can't get up out of the bed. Why he did not record that is beyond me." Tr. 73-74).   Plaintiff also testified that although she told Ms. Acker that her combination of medication was working, she continues to struggle with the symptoms and struggles to get things done in any given day. (Tr. 85).  Plaintiff testified that she experiences immobilizing pain and spasms due to colitis. (Tr. 75-76).  Plaintiff testified that she recently started medication without improvement. (Tr. 74).  Plaintiff testified that she recently began medication to address her frequent urination, which interferes with her sleep and she has to wake up, on average every hour. (Tr. 77, 84).  When the ALJ discussed recent normal tests regarding Plaintiff's lung-related symptoms, Plaintiff reiterated her subjective breathing complaints. (Tr. 77-78).

A VE appeared and testified. (Tr. 90-94). The VE opined Plaintiff could perform past relevant work and identified additional jobs that Plaintiff could perform that were unskilled. (Tr. 90-94).

### III.   Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and, (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be

less than a preponderance. *Jones*, 364 F.3d at 503. If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## IV.   Analysis

### A. Credibility

The ALJ found that Plaintiff was less than fully credible because: 1) the medical evidence showed that Plaintiff's mental impairments were controlled, except for an exacerbation in 2012 that did not meet the twelve-month duration requirement; 2) contradictions between her alleged activities of daily living and reported activities in medical records; 3) conservative treatment; 4) uncontradicted opinion indicating that her urinary and respiratory impairments did not affect her ability to work; 5) Plaintiff's receipt of unemployment; 6) Plaintiff's retirement for non-disability related reasons; 7) Plaintiff's report that her colitis was in abeyance; and 8) observations that Plaintiff's attention, concentration, and memory were intact. (Tr. 42-44).

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence,

the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p.  The credibility finding must be based on a consideration of the entire case record, considering several factors in totality.   SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Weidman v. Colvin*, No. 3:14-CV-0552-MEM-GBC, 2015 WL 6673830, at \*24-33 (M.D. Pa. Aug. 7, 2015) *report and recommendation adopted*, No. CV 3:14-552, 2015 WL 5829788 (M.D. Pa. Sept. 30, 2015).  There is a distinction between what an adjudicator must "consider" and what the adjudicator must explain in the disability determination.  *See* SSR 06-03p (explaining that to "consider" means to provide explanation sufficient for a "subsequent reviewer to follow the adjudicator's reasoning"); *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (social security regulations enumerating factors of an ALJ to consider "require only that the ALJ's decision include 'good reasons' . . . not an exhaustive factor-by-factor analysis").

Plaintiff argues that the ALJ erred in making adverse credibility determinations based on Plaintiff being the sole caretaker of an eight-year-old child, Plaintiff's activities of daily living ("ADLs"), and Plaintiff's sporadic social events, such as Thanksgiving, a reunion, and going to Disneyworld.  Pl. Brief at 13.  Plaintiff further argues that the ALJ erred in drawing an adverse inference from Plaintiff's receipt of unemployment benefits during the same period of time

that she alleged to be disabled.  Pl. Brief at 13-14.  Plaintiff does not address: 1) the medical evidence; 2) contradictions between her reports to medical providers and reports in support of her claim for benefits; 3) conservative treatment, or; 4) retirement for non-disability reasons.

The ALJ noted that Plaintiff "explained that she was able to function at [her] job and quit that job because she trusted that the father of her [child] would take care of her.  (Tr. 42). It was permissible for the ALJ to consider Plaintiff's work history, non-health related reasons for stopping work, and motivation to work as factors in determining Plaintiff's credibility.  *See e.g.*, *Hogan v. Apfel*, 239 F.3d 958 (8th Cir. 2001) (The closeness in time of plaintiff's on-the-job reprimand to her ceasing work cast doubt on her assertion that she quit her job because of pain and side effects of her pain medication); *Kane v. Colvin*, No. 3:13-CV-02469, 2015 WL 1513960, at *12 (M.D. Pa. Mar. 31, 2015) (noting that the plaintiff reported she was laid off because there was "not enough work for her," not because she was unable to work due to disability); *Pachilis v. Barnhart*, 268 F. Supp. 2d 473, 483 (E.D. Pa. 2003) (finding that a claimant incentive or disincentive to work is a permissible criterion bearing on his credibility).

The ALJ also relied on a lack of objective medical evidence to support Plaintiff's claim of disability.  (Tr. 43).  The ALJ summarized medical evidence that indicated Plaintiff experienced a temporary exacerbation of her symptoms due

to the illness and death of her child's father that did not meet the duration requirement. (Tr. 43).  This is a proper factor to be considered in the credibility assessment.  *See* SSR 96-7p.  The ALJ reasonable relied on medical expert opinion which evaluated the medical evidence, and concluded that it did not substantiate Plaintiff's claims.  (Tr. 100).  *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation.); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof"); 42 U.S.C.A. § 1382c(a)(3)(H)(i).

The ALJ also noted that Plaintiff reported symptoms inconsistently. (Tr. 42-44).  In Plaintiff's function report on May 17, 2012, she reported treatment for angioedema which can knock her off of her feet for weeks at time.  (Tr. 232-33).  Nine days earlier, on May 8, 2012, she reported that her respiratory symptoms had resolved.  (Tr. 362).  Plaintiff reported rarely needing medication to treat her asthma.  (Tr. 362). Similarly, medical records show that Plaintiff reported her colitis was in abeyance on July 12, 2013.  (Tr. 640).  Less than a month later, she testified that her colitis left her immobile and that she had not improved with medication.  (Tr. 75-76).

Plaintiff testified that she received unemployment benefits until May of 2012 and that in order to receive unemployment benefits; she contacted the agency every

two weeks.  (Tr. 58-59).  Plaintiff affirmed that she stated to the unemployment agency that she was available to work while receiving benefits and that she considered that she would be able to work in customer service up through May 2012.  (Tr. 59).  The ALJ directly asked Plaintiff to explain how she could assert that she was able to work in order to secure benefits from the unemployment agency while telling the social security agency that she could not work during the same time period.  (Tr. 60).  Plaintiff stated that she believed that she could have worked in customer service during the period that she is claiming disability, conceded the contradiction and did not state that she believed that she could only work part-time for the purposes of unemployment benefits, or gave any explanation for the contradiction.  (Tr. 59-61).  Receipt of unemployment, although not determinative alone, may be considered by the ALJ.  *See Myers v. Barnhart*, 57 F. App'x 990, 997 (3d Cir. 2003) (It is "entirely proper for the ALJ to consider that [Plaintiff's] receipt of unemployment benefits was inconsistent with a claim of disability during the same period"); *Burnside v. Colvin*, No. 3:13-CV-2554, 2015 WL 268791, at *17 (M.D. Pa. Jan. 21, 2015) (discussing authority from different circuits).

Plaintiff's activities of daily living do not indicate that she can perform substantial gainful activity, but do indicate inconsistencies. While ADLs and sporadic and transitory activities cannot be used to show an ability to engage in

"substantial gainful activity" (20 C.F.R. §§ 404.1572(c), 416.972(c); SSR 96-8P; *Fargnoli v. Massanari*, 247 F.3d 34, 40 n. 5 (3d Cir.2001)), it is permissible for such activities to be used to assess a claimant's credibility in light of any true contradiction between his or her alleged severity of symptoms and the claimant's activities.  *See e.g.*, *Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 188 (3d Cir. 2007) (finding significant a plaintiff's testimony about her daily activities was internally inconsistent, thus supporting the ALJ's determination of according her testimony little weight); *Smith v. Astrue*, 359 F. App'x 313, 317 (3d Cir. 2009) (claimant's testimony that she was essentially bedridden contradicted by evidence that she had been primary caretaker for small child for two years); *Gleason v. Colvin*, No. 3:14-CV-00021-GBC, 2015 WL 4232569, at *13 (M.D. Pa. July 13, 2015); *see also Orn v. Astrue*, 495 F.3d 625, 636 (stating that inconsistencies in testimony or between testimony and other evidence is proper reason to discredit a social security plaintiff).

Plaintiff acknowledged that the findings of her treating doctors contrast with her own report regarding the severity of her symptoms and stated that she disagreed with her doctors' more benign characterization of her symptoms.  (Tr. 73-74, 77-78).  When the ALJ read observations that Dr. Johnson made during an examination of July 15, 2013, observations that are repeated throughout the records, Plaintiff indicated that it was not a fair assessment of her depression.  (Tr.

73-74).  When the ALJ discussed recent normal tests regarding Plaintiff's lung-related symptoms, Plaintiff testified that no further testing was scheduled and stated that she did not understand why the records did not note her more severe symptoms.  (Tr. 77-78).  When Plaintiff's attorney asked for Plaintiff to described her medical problems, Plaintiff responded, in part, that "I don't care what the doctors have noted, this is what I'm living."  (Tr. 80).

At every session with Dr. Johnson, on October 9, 2011, October 21, 2011, January 26, 2012, May 7, 2012, June 18, 2012, August 6, 2012, September 17, 2012, October 11, 2012, and November 5, 2012, Dr. Johnson observed that Plaintiff's activities of daily living were appropriate.  (Tr. 305, 313, 318, 330, 469, 479-80). On October 21, 2011, Plaintiff reported to Dr. Johnson that she lived with her nine-year-old child and was able to complete her activities in daily living ("ADLs") independently.  (Tr. 329).  Plaintiff stated that she was able to maintain her home and do household chores.  (Tr. 329).  On October 24, 2011, she reported that currently she's able to get to the store if she and her child need food. (Tr. 297). Plaintiff reported that she can compel herself to do essential tasks, although she has to push herself to do anything and must keep pushing herself to finish the task and finds this exhausting. (Tr. 298).  On September 17, 2012, Plaintiff reported making an effort to get her child out of the house and playing with friends more.  (Tr. 475).

In the medical records, on January 19, 2012, Plaintiff reported going to the gym regularly; on May 7, 2012, she reported she was getting exercise but could not participate in group classes; on August 28, 2012, she reported that she takes her child to the YMCA and also works out there; and on October 24, 2012, Plaintiff reported going to the gym regularly. (Tr. 305, 314, 466, 476). However, in Plaintiff's function report submitted May 17, 2012, she indicated that she only goes outside to take her child to and from school and due to her depression and anxiety it is difficult to deal with life and people. (Tr. 236). Plaintiff stated that she could only walk five minutes before she would need to stop and rest until she has counted to thirty. (Tr. 238). Plaintiff reported that her medication relieves pain for four hours; however, the side effects render her immobile. (Tr. 242). In 2013, she testified that she "cannot walk up a flight of stairs without feeling like I'm going to lose my breath." (Tr. 77-78). Although her ability to go to the gym regularly does not independently show she can perform SGA, it is a documented inconsistency with the claims she submitted in support of her application for disability benefits under the Act. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P. Consequently, some of Plaintiff's activities of daily living contradict the claims she made in support of obtaining DIB.

Thus, even if the ALJ erred in drawing an adverse credibility inference from the fact that Plaintiff cares for an eight-year-old child, such error is harmless. *See Williams v. Barnhart*, 87 F. App'x 240, 243-44 (3d Cir. 2004); *Napoli v. Colvin*, No. 3:13-CV-01815, 2014 WL 2808603, at *11 at n.23 (M.D. Pa. June 20, 2014) (finding harmless error harmless error under the totality of the evidence); *Bivins ex rel. N.B. v. Astrue*, No. 5:11-CV-51 MSH, 2011 WL 5859954, at *5 (M.D. Ga. Nov. 22, 2011) ("Considering the totality of the medical evidence, the ALJ's erroneous reference to a statement . . . is harmless . . . . A remand to have the ALJ perfect the record as to this statement would serve no practical purpose, would not alter the ALJ's findings, and would be a waste of judicial and administrative resources"); *Rahman v. Astrue*, No. 1:11-CV-3094-JSA, 2012 WL 5507314, at *12 (N.D. Ga. Nov. 14, 2012) (finding harmless record where the ALJ discredited a plaintiff's testimony "on a number of valid grounds").

## B. VA Disability Rating

Plaintiff testified that she received a 70% disability rating from the VA. (Tr. 65). Plaintiff argues that the ALJ failed to develop the record to obtain documentation of a disability determination ("rating") of 70 percent from the VA and that the Judge erred in giving little weight to the disability rating of 70 percent from the VA based on the reasoning that it was not clear "that the standards for determination of disability under the SSA were applied in rendering the rating,"

and it was not clear "whether such a determination was rendered by an acceptable medical source." Pl. Brief at 9-10. As will be explained below, the Court finds that the ALJ did not fail to develop the record and the ALJ gave sufficient consideration to Plaintiff's VA disability rating.

### i. VA Disability Compensation

The VA disability rating process is substantively different from the social security disability determinations. *See e.g.*, *Bowyer v. Brown*, 7 Vet. App. 549, 552 (1995) (recognizing that "there are significant differences in the definition of disability under the Social Security and VA systems"); *Hannington v. Sun Life & Health Ins. Co.*, 711 F.3d 226, 233-34 (1st Cir.) *cert. denied*, 134 S. Ct. 285, 187 L. Ed. 2d 152 (2013). The court in *Fitzgerald v. Astrue* observed:

> The Seventh Circuit explained that attributing "great" weight to a disability determination of the VA "disregards the substantial difference between the criteria used in the [VA and the SSA] programs." *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir.2006). The court further stated that "the Department of Veterans Affairs requires less proof of disability than the Social Security Administration does." *Id.* Moreover, even in circuits which hold that other agency disability determinations are entitled to "great weight," courts still give varying weight to such determinations, "depending upon the factual circumstances of each case." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

*Fitzgerald v. Astrue*, No. CIV.A. 2:08-CV-170, 2009 WL 4571762, at *7 (D. Vt. Nov. 30, 2009). As the First Circuit Court of Appeals observed in *Hannington v. Sun Life & Health Ins. Co.*:

> [S]ervice-connected disability compensation . . . is decidedly different [from to the benefits obtainable under the Social Security Act], and it is the substantive nature of this benefit that must be compared to those under the comparator statutes. . . .
>
> There are very important substantive differences between the Veterans' Benefits Act and the Social Security Act . . . especially between the service-connected disability compensation . . . and the available benefits under the comparator acts. These differences render the Veterans' Benefits Act, as a matter of statutory construction, dissimilar to the Social Security Act . . . .

*Hannington v. Sun Life & Health Ins. Co.*, 711 F.3d 226, 233-34 (1st Cir.) *cert. denied*, 134 S. Ct. 285, 187 L. Ed. 2d 152 (2013). "Congress has created a paternalistic veterans' benefits system to care for those who served their country in uniform. *See, e.g.*, *Comer v. Peake*, 552 F.3d 1362, 1368 (Fed. Cir. 2009); *Hensley v. West*, 212 F.3d 1255, 1262 (Fed. Cir. 2000) (recognizing that the veterans' benefit system is "uniquely pro-claimant")[6]; *Nolen v. Gober*, 222 F.3d 1356, 1361 (Fed.Cir.2000) (pointing out Congress' recognition of the "strongly and uniquely pro-claimant system of awarding benefits to veterans") (citations omitted). The U.S. Supreme recognized that:

> Congress has expressed special solicitude for the veterans' cause. A veteran, after all, has performed an especially important service for the Nation, often at the risk of his or her own life. And Congress has made clear that the VA is not an ordinary agency. Rather, the VA has a statutory duty to help the veteran develop his or her benefits claim.

---

[6] While the Social Security Act has been described as "unusually protective" of claimants, *Heckler v. Day*, 467 U.S. 104, 106 (1984), the discussion below illustrates how the VA system is significantly more pro-claimant.

*Shinseki v. Sanders*, 556 U.S. 396, 412, 129 S. Ct. 1696, 1707, 173 L. Ed. 2d 532 (2009); *see also* H.R. REP. 100-963, 13, 1988 U.S.C.C.A.N. 5782, 5795; *Jaquay v. Principi*, 304 F.3d 1276, 1280 (Fed. Cir. 2002) *overruled on other grounds by Henderson v. Shinseki*, 589 F.3d 1201 (Fed. Cir. 2009) (noting Congress' recognition of the "strongly and uniquely pro-claimant system of awarding benefits to veterans") (citations omitted)).

The VA provides the following types of rating and compensation determinations for "service-connected" disabilities[7]: 1) schedular; 2) extra-schedular; and, 3) Total Disability Based on Unemployablity ("TDIU").[8]  There is the baseline "schedular" rating which is derived from a "schedule of ratings" with diagnostic codes found in 38 C.F.R. Chapter 1, Part 4.  The United States Court of Appeals for Veterans Claims explained that "the rating schedule is based on the 'average impairment in earning capacity caused by a disability,' whereas entitlement to TDIU is based on an individual's particular circumstance." *Rice v. Shinseki*, 22 Vet. App. 447, 452 (2009) (quoting *Thun v. Peake*, 22 Vet. App. 111, 116 (2008)). A veteran can receive 100 percent disability compensation through ratings as well as through a finding of Total Disability based on Individual Unemployability ("TDIU").  The "rating schedule" is:

---

[7] 38 U.S.C.A. § 1501 et seq  governs "non-service connected" disabilities.
[8] There is also "Special Monthly Compensation" ratings for specific impairments. *See* 38 C.F.R. § 3.350; *see also* 38 U.S.C. §§ 1114, 1134.

> [P]rimarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The percentage ratings represent as far as can practically be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations. Generally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability.

38 C.F.R. § 4.1. Section 4.15 explains:

> The ability to overcome the handicap of disability varies widely among individuals. The rating, however, is based primarily upon . . . *the economic or industrial handicap which must be overcome and not from individual success in overcoming it.*

38 C.F.R. § 4.15 (emphasis added).

The VA rates the degree of a veteran's impairment as categorized by diagnostic codes ("DC") (38 C.F.R. §4.27) that correlate to different impairments and then the degree of impairment severity is assigned a rating ranging from zero to 100 percent, in increments of ten.  38 U.S.C. §§ 1114, 1134, 1155; 38 C.F.R. §§ 38 C.F.R. 3.340, 4.25, 4.31. Different diagnostic codes are allotted maximum available rating percentages that may or may not equal 100 percent for a single diagnostic code.[9]  Also, a veteran can get different rating percentages for different impairments which are combined for a total rating percentage.  38 C.F.R. § 4.25. [10]

---

[9] For example, the highest rating for burn scars under diagnostic code 7800 is 80%. 38 C.F.R. § 4.118, DC 7800.

[10] For combined ratings "a 50 percent disability and a 30 percent disability" would equal a rating of 70 percent, and "a disability of 40 percent, and another disability of 20 percent" would equal a rating of 50 percent. *See* 38 C.F.R. § 4.25.

There are five levels of the decision making and appeal process that a veteran can pursue with regards to a rating decision. *E.g. Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 856-58 (9th Cir. 2011) *opinion vacated on other grounds*, 678 F.3d 1013 (9th Cir. 2012); *VA Adjudication Procedures Manual* (M21–1 Part 3). The initial rating specialist is called a "Rating Veterans Service Representative" and if a veteran is unsatisfied with the rating percentage determined by the "Rating Veterans Service Representative," the veteran can appeal for a de novo review of law and fact by a senior ratings specialist called a Decision Review Officer ("DRO"), and if still unsatisfied, a veteran can appeal for another de novo review of law and fact before the BVA. *E.g.* 38 C.F.R. § 20.1507; *VA Adjudication Procedures Manual* (M21–1 Part 3); *Palmquist v. Shinseki*, 689 F.3d 66, 68 (1st Cir. 2012).[11] The rating specialists and the BVA are "unqualified" to make medical conclusions. *See e.g.*, *Carr v. McDonald*, No. 14-3204, 2015 WL 7176138, at *4 (Vet. App. Nov. 16, 2015) (finding that the BVA was "unqualified" to make medical conclusions regarding causation of sinus symptoms and whether a veteran's sinus symptoms were chronic); *Ayers v. McDonald*, No. 14-2387, 2015 WL 5881915, at *4-5 (Vet. App. Oct. 8, 2015) (finding that the BVA was not "competent" to make a medical conclusion regarding heart disease); *Kahana v. Shinseki*, 24 Vet. App. 428, 435 (2011); *Colvin v. Derwinski*, 1 Vet. App. 171, 172

---

[11] *See* http://www.benefits.va.gov/WARMS/M21_1MR3.asp#d (last accessed January 15, 2016).

(1991); *Moore v. Nicholson*, 21 Vet. App. 211, 218 (2007) *rev'd on other grounds sub nom. Moore v. Shinseki*, 555 F.3d 1369 (Fed. Cir. 2009).[12]   In other words, rating decisions are non-medical "other source" evidence.   *See* 20 C.F.R. §§ 404.1513, 404.1527, 416.913, 416.927; SSR 06-03P; *Forster v. Colvin*, No. 3:13-CV-02699-GBC, 2015 WL 1608741, at *8 (M.D. Pa. Apr. 10, 2015).

Rating decisions indicate the diagnostic code, the period of time for which the rating determination applies, and often consist of lengthy boilerplate language quoting verbatim from the diagnostic codes and percentage of severity that applies to the veteran's symptoms. *See e.g.*, *Lucas v. Astrue*, No. 5:12-CV-131-FL, 2012 WL 6917052, at *9 (E.D.N.C. Dec. 28, 2012) report and recommendation adopted, No. 5:12-CV-131-FL, 2013 WL 239195 (E.D.N.C. Jan. 22, 2013) (doubting the usefulness of the VA rating decision at the initial level, describing it as "essentially a form opinion, unaccompanied by any written report" and that the "remaining information contained therein concerns the processing and timing of disability payments"); *McCleary v. Colvin*, No. 1:15-cv-00172-JEJ-GBC at ECF No. 18 (M.D. Pa. January 25, 2016); *(Title Redacted by Agency)*, Bd. Vet. App. 1542048

---

[12] *See also* 38 C.F.R. §§ 4.2, 4.6 (how an adjudicator evaluates the evidence); *Culver v. McDonald*, No. 14-1458, 2015 WL 1768682, at *2 (Vet. App. Apr. 20, 2015); *Evans v. McDonald*, 27 Vet. App. 180, 188 (2014); *Moore v. Nicholson*, 21 Vet. App. 211, 218 (2007) ("[t]he medical examiner provides a disability evaluation and the rating specialist interprets medical reports in order to match the rating with the disability"), *rev'd on other grounds sub nom. Moore v. Shinseki*, 555 F.3d 1369 (Fed. Cir. 2009); *VA Adjudication Procedures Manual*, M21-1_III_iv_1(c), (d).

(Sept. 28, 2015); *(Title Redacted by Agency)*, Bd. Vet. App. 1436677 (Aug. 15, 2014).

Fulltime employment does not necessarily contradict a 70% disability rating. *See e.g.*, *Jarrard v. Dep't of Justice*, 669 F.3d 1320, 1321 (Fed. Cir. 2012) (80 percent rating qualifying for federal hiring preference under 5 U.S.C. § 2108(3)(C)); *Spence v. Foxx*, No. CIV. 11-3972 JBS/AMD, 2014 WL 7405207, at *2 (D.N.J. Dec. 30, 2014), appeal dismissed (Mar. 19, 2015); *(Title Redacted by Agency)*, Bd. Vet. App. 1524856 (June 10, 2015) (finding only 70 percent PTSD rating warranted for employed veteran); *(Title Redacted by Agency)*, Bd. Vet. App. 1513531 (Mar. 30, 2015) (granting a veteran 70 percent rating for PTSD while "still employed and [having] a good relationship with his wife and child"); *(Title Redacted by Agency)*, Bd. Vet. App. 1442296 (Sept. 22, 2014) (veteran employed with 70 percent rating for PTSD); *(Title Redacted by Agency)*, Bd. Vet. App. 1440791 (Sept. 12, 2014) (granting a veteran 70 percent rating for PTSD while still gainfully employed); *cf. Rutledge v. Illinois Dep't of Human Servs.*, 785 F.3d 258, 259 (7th Cir. 2015) (noting that "[a] veteran is deemed totally disabled if he suffers from an impairment that would 'render it impossible for the *average* person to follow a substantially gainful occupation,' even if the veteran applying for benefits is able, through exceptional ability or exertion, to work full time").

In contrast, TDIU "may be assigned" when the veteran has a "scheduler rating less than [100%]," but is "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16, *see Rice v. Shinseki*, 22 Vet. App. 447, 452 (2009). "[V]eterans . . . who are unable to secure and follow a substantially gainful occupation by reason of disabilities which are likely to be permanent shall be rated as permanently and totally disabled." 38 C.F.R. §4.17.   Sections 4.16 and 4.17 exclude marginal employment from the definition of substantial gainful occupation using standards such as income level or protected employment in a sheltered workplace. *See id.*

Even with TDIU under 38 C.F.R. § 4.17 and 100 percent schedular ratings, which are often considered most similar to SSA disability regulations, there exist significant differences from SSA disability determination requirements. *See e.g.*, *Eastvold v. Astrue*, No. CIV 03-3054 MJD/RLE, 2010 WL 1286334, at *44 (D. Minn. Feb. 12, 2010) *report and recommendation adopted as modified*, No. CIV 03-3054 MJD/RLE, 2010 WL 1286338 (D. Minn. Mar. 29, 2010) ("While we acknowledge some facial inconsistency, which arises from the VA's finding that an individual is totally disabled, when the same individual is denied Social Security benefits, the basis for different rulings can be explained by the differences in the underlying Records, and opinions presented, and by different purposes served by the distinctive standards of disability ratings"); *Dean v. Astrue*, No. C08-

5112RJB-KLS, 2008 WL 4585328, at *7 (W.D. Wash. Oct. 14, 2008) ("given the difference in the VA's approach to determining entitlement to individual unemployability . . . it is not even clear that a VA rating decision of 100% equates with a finding of disability under the Social Security regulations").  For instance, there are substantive differences in the definition of disability and "unemployability" for VA decisions compared to the Social Security Act and substantive differences between VA disability and Social Security disability regarding the amount of money an individual can still earn and be considered disabled.  *Compare* 38 C.F.R. § 4.17(a) (VA definition of total disability based on unemployability) *with* 20 C.F.R. §§ 404.1505, 416.905 (SSA definition of disability for adults); *see e.g.*, *Chubb v. Colvin*, No. 1:14-CV-107-MP-GRJ, 2015 WL 5016832, at *5-7 (N.D. Fla. Apr. 17, 2015) *report and recommendation adopted*, No. 1:14-CV-00107-MP-GRJ, 2015 WL 5016509 (N.D. Fla. Aug. 24, 2015) (discussing differences between TDIU under the VA and disability determinations under the SSA); *Jenkins v. Astrue*, No. 1:11-CV-23-MP-GRJ, 2012 WL 807487, at *10 n. 26 (N.D. Fla. Feb. 8, 2012) *report and recommendation adopted*, No. 1:11CV23-MP-GRJ, 2012 WL 807263 (N.D. Fla. Mar. 9, 2012).  As the court in *Jenkins v. Astrue* observed:

> [U]nder VA disability the fact that a claimant earned up to half of the usual remuneration is not a bar to being disabled so long as the restriction to securing employment relates to the disability. 38 C.F.R. § 4.17(a). In contrast, under the Social Security regulations a person is

not disabled if he engages in substantial gainful activity. Substantial gainful activity is defined by dollar limits for each year and are based on a national dollar limit. *See*, 20 C.F.R. § 404.1574. Thus, a claimant who makes less than one half of the claimant's remuneration from a job can be considered disabled by the VA while the amount of the remuneration for Social Security disability purposes could be high enough to constitute substantial gainful activity thus precluding a finding of disability.

*Jenkins v. Astrue*, No. 1:11-CV-23-MP-GRJ, 2012 WL 807487, at *10 n. 26 (N.D.

Fla. Feb. 8, 2012) *report and recommendation adopted*, No. 1:11CV23-MP-GRJ,

2012 WL 807263 (N.D. Fla. Mar. 9, 2012).

## ii.  Evidentiary Requirements

The VA rules for evaluating evidence are distinguishable from the SSA.  For

example within the VA, "[w]hen after careful consideration of all procurable and

assembled data, a reasonable doubt arises regarding the degree of disability such

doubt will be resolved in favor of the claimant." 38 C.F.R. § 4.3.  For VA

disability determinations, an adjudicator will consider "competent medical

evidence" which means:

> evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions. Competent medical evidence may also mean statements conveying sound medical principles found in medical treatises. It would also include statements contained in authoritative writings such as medical and scientific articles and research reports or analyses.

38 C.F.R. § 3.159(a)(1).  According to the Federal Circuit Court of Appeals in

*Parks v. Shinseki*:

> In the case of competent medical evidence, the VA benefits from a presumption that it has properly chosen a person who is qualified to provide a medical opinion in a particular case. Viewed correctly, the presumption is not about the person or a job title; it is about the process.
>
> A presumption exists, of course, to eliminate the burden to produce evidence. As a result, the Veterans Court did not need to examine the dictionary definition of "nurse practitioner" or to require the government to proffer evidence about the qualifications of the medical professional in this case. . . .

*Parks v. Shinseki*, 716 F.3d 581, 585 (Fed. Cir. 2013) *cert. denied*, 134 S. Ct. 2661, 189 L. Ed. 2d 209 (2014) (internal citations omitted).  While the SSA has distinct requirements and a hierarchy of authority of medical and lay evidence, the VA generally does not require specific credentials or qualifications for the weight given for medical opinion evidence for physical impairments.  *Compare* 38 C.F.R. § 3.159 *with* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) *and Forster v. Colvin*, No. 3:13-CV-02699-GBC, 2015 WL 1608741, at *8 (M.D. Pa. Apr. 10, 2015) (discussing weight accorded to "acceptable medical source" opinions and opinions from those who are not "acceptable medical sources"); *Bourdreau v. Shinseki*, No. 08-3126, 2010 WL 3119531, at *4 (Vet. App. Aug. 9, 2010) (refusing to address argument that a vocational specialist's opinion should be allotted more weight since the court could not make factual determinations in the first instance and that "competency 'is a legal concept determining whether testimony may be heard and considered by the trier of fact, while [weight and credibility] is a factual

determination going to the probative value of the evidence to be made after the evidence has been admitted'"). For example, while SSA regulations consider opinions from a nurse practitioner or physician assistant to be "non-medical opinions" which cannot be the basis to establish a diagnosis and may be accorded less weight, (*Forster v. Colvin*, No. 3:13-CV-02699-GBC, 2015 WL 1608741, at *8), the same opinions would be considered "competent" within the VA disability determination process. *See e.g.*, 38 C.F.R. § 3.159(a)(1); *Parks v. Shinseki*, 716 F.3d 581, 585; *Ruiz-Rojas v. Peake*, No. 06-3590, 2008 WL 4414306, at *3 (Vet. App. Sept. 16, 2008) (compensation and pension examination conducted by a nurse practitioner).

While not delineating specific required credentials for mental health opinions rendered by private treatment sources, the VA, however, has requirements regarding qualifications and credentials for C&P opinions rendered for mental health impairments. *See* VHA Directive 2012-021, "Qualifications For Examiners Performing Compensation And Pension (C&P) Mental Disorder Examinations."[13] Even with the requirements articulated in VHA Directive 2012-021, such are not as

---

[13]The VHA Directive 2012-021(4)(b) specifies the qualifications for mental health professionals to render initial C&P opinions for mental disorders which include, for example, "Non-licensed doctoral-level psychologists working toward licensure under close supervision by a board-certified, or board-eligible, psychiatrist or a licensed doctoral-level psychologist." VHA Directive 2012-021(4)(b), http://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=2780 (Last accessed January 7, 2016).

stringent as those detailed in 20 C.F.R. §§ 404.1513(a), 416.913(a) which are limited to licensed physicians and licensed or certified psychologists.

## C. Duty to Develop

In the social security context, the ALJ must develop the record and provide an explanation for how evidence in the record is treated. *See e.g.* 38 C.F.R. § 4.3. "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel,* 530 U.S. 103, 111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). "While an ALJ is required to assist the claimant in developing a full record, he or she has no such obligation to 'make a case' for every claimant." *Kenyon v. Colvin*, 2013 WL 6628057 (M.D. Pa. 2013). The burden still "lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987), and 20 C.F.R. §§ 404.1512(a) and 416.912(a)). The ALJ "shall inquire fully into the matters at issue and shall receive in evidence the testimony of witnesses and any documents which are *relevant and material* to such matters." 20 C.F.R. § 410.640 (emphasis added).

"[A] challenge to the development of the record must allege prejudice." *Hartzell v. Colvin*, No. 3:14-CV-00936-GBC, 2015 WL 5829780, at *8 (M.D. Pa. Oct. 1,

2015) (citing *Coe v. Astrue*, 3:07–CV–0500, 2008 WL 818948 (M.D. Pa. Mar. 25, 2008); *McCurry v. Astrue*, CIV.1:CV–07–1235, 2008 WL 2914368 (M.D. Pa. July 23, 2008)). "The question is not 'whether every question was asked which might have been asked ... [but] whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" *Jozefick v. Shalala,* 854 F.Supp. 342, 344 (M.D. Pa. 1994) (Vanaskie, J.) (quoting *Edwards v. Sullivan,* 937 F.2d 580, 585–86 (11th Cir.1991)); *see also Reefer v. Barnhart*, 326 F.3d 376, 380-81 (3d Cir. 2003) (Plaintiff was prejudiced by the failure of the ALJ to obtain medical records, including a head CT, documenting brain stem surgery and a stroke); *Livingston v. Califano,* 614 F.2d 342, 345 (3d Cir.1980) (Claimant was "prejudiced by" the failure to develop the record (internal citations omitted); *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (Claimant was "prejudiced by lack of counsel and passivity of the ALJ."); *Cherundolo v. Colvin*, No. 1:14-CV-1118, 2015 WL 5567966, at *13 (M.D. Pa. Sept. 21, 2015) (Remanding where "Plaintiff has not identified any evidentiary gap arising from" the alleged failure to develop the record).

Allowing a claimant to secure a remand for failing to develop the record without any showing of prejudice would allow a back door around the materiality requirement of a sentence six remand. Pursuant to sentence six of 42 U.S.C. §405(g):

> The court may, on motion of the Commissioner of Social Security
> made for good cause shown before the Commissioner files the
> Commissioner's answer, remand the case to the Commissioner of
> Social Security for further action by the Commissioner of Social
> Security, and it may at any time order additional evidence to be taken
> before the Commissioner of Social Security, but only upon a showing
> that there is new evidence <u>which is material</u> and that there is good
> cause for the failure to incorporate such evidence into the record in a
> prior proceeding.

*Id*. (emphasis added).   In order to be material, "there [must] be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). Consequently, whether Plaintiff is alleging that the ALJ failed to develop the record or alleging that new and material evidence require remand pursuant to Sentence Six, she must demonstrate that the evidence was material and she was prejudiced by the omission.

The ALJ "will evaluate every medical opinion" in the record. 20 C.F.R. 404.1527(c). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). If the medical opinion is from a treating physician, the ALJ must "give good reasons in [the] notice of determination or decision" for rejecting the opinion. 20 C.F.R. 404.1527(c)(2). Acceptable medical

sources include only licensed physicians, psychologists, optometrists, and podiatrists; and "qualified speech-language pathologists." 20 C.F.R. §404.1513(a). An ALJ should still consider evidence from sources that are not acceptable medical sources. *See* SSR 06-3p. When the evidence is from "[m]edical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists," the ALJ should apply "the factors for weighing opinion evidence" contained in 20 C.F.R. §404.1527(c).SSR 06-3p. "Opinions from 'non-medical sources' who have seen the individual in their professional capacity," such as social workers, counselors, and teachers, also "should be evaluated by using the applicable factors listed in" 20 C.F.R. §404.1527(c). SSR 06-3p. ALJs should evaluate opinions from these sources that were "used by other agencies" and are "in [the Social Security] case record" using the factors in 20 C.F.R. §404.1527(c). However, there is a distinction between opinions used by other agencies and the ultimate administration determination by other agencies. *See* SSR 06-3p. The ALJ is merely required to "explain the consideration given to these decisions" and is not explicitly instructed to consider the factors in 20 C.F.R. §404.1527(c). SSR 06-3p. In contrast, SSR 06-3p provides that "in considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would

be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

### i.  Analysis: Omission of Rating Decision Letter

Plaintiff fails to establish that she was prejudiced by allegedly wrongful omission of the ratings decision letter because she failed to proffer the letter to the ALJ, the Appeals Council, and the Court.  The Court cannot engage in meaningful judicial review of Plaintiff's claim that the ALJ erred in failing to obtain documentation if the Court cannot review the allegedly wrongfully omitted documentation.  *See Herring v. Colvin*, No. 3:12-cv-2211-MWB (M.D. Pa. Sept. 29, 2014) (Adopting Report and Recommendation that claimant's appeal be denied where claimant alleged the ALJ should have obtained additional medical records, but did not proffer those records into evidence before the Appeals Council or Court).  As in *Herring*, "Plaintiff may not need to proffer new evidence.  However, Plaintiff must proffer the evidence, inform the Court as to the content of that evidence, provide a new argument to the Court based on that evidence, or otherwise make a showing of prejudice."  Plaintiff is in a better position than the ALJ, and the Court, to provide the rating decision and has not done so.  *See id.* at 22 (citing *Money v. Barnhart*, 91 Fed. Appx. 210, 215 (3d Cir.2004)).

Plaintiff also does not enumerate what "relevant and material" fact that the VA rating document would provide that cannot already be discerned from Plaintiff's testimony, the VA medical records, VA statutes and regulations. (Pl. Brief). As described above, a rating decision has more information than a simple rating percentage. For example a rating decision indicates the particular diagnostic code and the time frame to which the rating applies. However, the rating decision is authored by an individual "unqualified" to make medical conclusions, *Carr v. McDonald*, No. 14-3204, 2015 WL 7176138, at *4 (Vet. App. Nov. 16, 2015) and is "essentially a form opinion, unaccompanied by any written report." *Lucas v. Astrue*, No. 5:12-CV-131-FL, 2012 WL 6917052, at *9 (E.D.N.C. Dec. 28, 2012) report and recommendation adopted, No. 5:12-CV-131-FL, 2013 WL 239195 (E.D.N.C. Jan. 22, 2013). Having only a rating percentage is not fatal to an ALJ's decision when the rating criteria is discernable from the VA regulations, Plaintiff's testimony, and the VA medical record is available.

The VA has a "General Rating Formula for Mental Disorders" which, is based on the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–IV). 38 C.F.R. § 4.130. While a rating decision indicating the diagnostic code may be relevant information for physical impairments, the diagnostic codes for all mental disorders are rated based on the same indicia of severity (*see e.g.*,

*Mauerhan v. Principi*, 16 Vet. App. 436, 441-42 (2002)), similar to a GAF score.

*Compare* 38 C.F.R. § 4.130 *with supra* note 5 (explaining GAF scores).[14]

Consequently, Plaintiff has not demonstrated that the ALJ failed to obtain evidence that was relevant and material. *See* 20 C.F.R. 410.640. Plaintiff has identified no "evidentiary gaps" that suggest she was prejudiced by its omission. *Jozefick,* 854 F.Supp. at 344 (internal citations omitted). Plaintiff's failure to proffer the ratings documentation precludes the Court from concluding that she was prejudiced by its omission. *Id.*

---

[14] A rating of 70 percent for a mental disorder (including PTSD) lists the following criteria:

> Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships.

38 C.F.R. § 4.130; *see e.g.*, *(Title Redacted by Agency)*, Bd. Vet. App. 1546111 (Oct. 30, 2015) (granting a 70 percent rating under diagnostic code 9411 for PTSD). The symptoms listed under 38 C.F.R. § 4.130:

> are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Accordingly, any suggestion that the Board was required, in complying with the regulation, to find the presence of all, most, or even some, of the enumerated symptoms is unsupported by a reading of the plain language of the regulation.

*Mauerhan v. Principi*, 16 Vet. App. 436, 442 (2002).

Plaintiff also fails to establish that the ALJ's explanation for assigning little weight to the 70% rating was insufficient.  While the ALJ's reasoning lacks clarity, it still allows for meaningful judicial review.  *See e.g.*, *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir.2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Varano v. Colvin*, No. 3:14-CV-001467-GBC, 2015 WL 5923615, at *9 (M.D. Pa. Oct. 9, 2015).  It is reasonable to discern that the ALJ is stating that the VA rating of 70 percent warrants little weight if the standards for determining disability under the VA are different from those of the SSA and if the rating determination was not made from an acceptable medical source.  The ALJ also gave additional reasons for affording the 70 percent rating little weight, the ALJ explained:

> Moreover, this determination is inconsistent with the medical evidence establishing the stabilization and improvement in [Plaintiff's] mental health symptoms through medication management and therapy such that on November 5, 2012 [Plaintiff] was described as doing reasonably well, nor is this determination consistent with notes of treatment indicating that [Plaintiff] was very busy over the holidays. For these reasons, this determination is given little weight.

(Tr. 46).

Different types of evidence require different types of explanation.  *See e.g.* 20 C.F.R. §404.1527(c).  "There is no requirement that the ALJ discuss in [the] opinion every tidbit of evidence included in the record." *Hur v. Comm'r Soc Sec.*,

94 F. App'x130, 133(3d Cir. 2004).   The ratings determination is not a medical opinion, because it is not from an acceptable medical source, and is not an opinion from another medical source.   *See* SSR 06-3p.   While disability determinations from other government agencies are not binding (20 CFR §§ 404.1504, 416.904), they must be considered.   SSR 06-03p.   By "consider," SSR 06-03P means to provide explanation sufficient for a "subsequent reviewer to follow the adjudicator's reasoning."   SSR 06-03P; *see also Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 510 (6th Cir. 2013); *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (social security regulations enumerating factors of an ALJ to consider "require only that the ALJ's decision include 'good reasons . . . not an exhaustive factor-by-factor analysis").   The Court further notes that "[n]either 20 C.F.R. § 404.1504 nor SSR 06–03p requires that any specific level of weight be accorded a VA disability decision."   *Wilson v. Colvin*, No. 2:13-CV-197-JDL, 2014 WL 4715406, at *5 (D. Me. Sept. 22, 2014).

The ALJ explicitly acknowledged and addressed[15] the 70 percent rating. (Tr. 46).   The ALJ's consideration was based on valid reasoning.   As explained

---

[15] The Court notes that in 1969, the Third Circuit Court of Appeals in *Pulaski v. Finch*, addressed the significance of a VA disability determination in a SSA decision where the VA concluded that a veteran qualified as "permanently and totally disabled from non-service connected disability" under a 1964 version of 38 U.S.C. § 521 (which was later amended and recodified to 38 U.S.C. § 1521(a)). *Pulaski v. Finch*, 415 F.2d 613, 613 (3d Cir. 1969).   In *Pulaski*, the Court held that the ALJ could not ignore a VA disability determination. *Id.*   Here, the ALJ expressly considered the

above, the standards for determining disability under the VA are substantively different from those of the SSA. *See e.g.*, *Jenkins v. Astrue*, No. 1:11-CV-23-MP-GRJ, 2012 WL 807487, at *10-11 (N.D. Fla. Feb. 8, 2012) *report and recommendation adopted*, No. 1:11CV23-MP-GRJ, 2012 WL 807263 (N.D. Fla. Mar. 9, 2012) (finding no error in ALJ determination that the VA's disability determination of "total disability" should be accorded less weight based on the "substantial differences in the criteria used by the VA in making disability evaluations as compared to disability decisions under the Social Security Act"); *Barnett v. Astrue*, No. 3:10-CV-1316, 2012 WL 75046, at *15-18 (S.D.W. Va. Jan. 10, 2012) (affirming ALJ decision giving "little weight" to VA rating); *cf. Hacia v. Comm'r of Soc. Sec.*, 601 F. App'x 783, 785-86 (11th Cir. 2015) (finding no requirement that an ALJ must make detailed findings in support of his conclusion that the relative disability standards differ where "the ALJ's decision reflects that he considered both standards, determined that the DOD's disability standard was lower than that of the Commissioner, and thus assigned limited weight to the DOD's determination"); *but see e.g.*, *Pratts v. Comm'r of Soc. Sec.*, No. 13-CV-2372 FLW, 2015 WL 5139148, at *13-17 (D.N.J. Sept. 1, 2015), *but cf. Gross v. Comm'r*, Soc. Sec., No. CIV. WDQ-13-1274, 2014 WL 3672878, at *4 (D. Md.

---

70% rating, so *Pulaski* doesn't apply. Also, *Pulaski v. Finch* addressed an issue involving a total disability determination from a statutory scheme that relates to non-service connected disabilities (38 U.S.C. § 1501 et seq.) which has since been amended from the time of decision, and the facts and law of this instant case are distinguishable from *Pulaski v. Finch*. *See also McCleary v. Colvin*, No. 1:15-cv-00172-JEJ-GBC at ECF No. 18 (M.D. Pa. January 25, 2016).

July 22, 2014) (discussion of child disability under SSA and VA regulations). The Court notes that this case does not involve a schedular or non-schedular 100 percent rating (also known as "total" disability rating), a TDIU disability determination, or a finding of non-service connected permanent and total disability under 38 U.S.C. § 1521(a).[16]

Moreover, the ALJ's decision to accord little weight to the VA rating was not solely based on Plaintiff's alleged errors. The ALJ also explained that the VA rating determination was inconsistent with the medical evidence. (Tr. 46). Such is sufficient to meet the substantial evidence requirement. *See Davis v. Astrue*, No. 10CV1732 BEN NLS, 2011 WL 3740365, at *10 (S.D. Cal. July 29, 2011) report and recommendation adopted, No. 10-CV-01732 BEN NLS, 2011 WL 3741010 (S.D. Cal. Aug. 24, 2011) (affirming decision where ALJ reviewed the evidentiary basis for the VA's rating and considered evidence from non-examining doctors that was not available to the VA).

The Court finds that the ALJ committed no error in according little weight to the VA rating of 70 percent for PTSD. Even if the ALJ erred, such would be harmless and a remand would not alter the outcome of the case. *See e.g.*, *Williams v. Barnhart*, 87 F. App'x 240, 243-44 (3d Cir. 2004).

---

[16] Therefore, courts which have addressed the significance of VA total disability determinations are not persuasive in this instant case. *See McCleary v. Colvin*, No. 1:15-cv-00172-JEJ-GBC at ECF No. 18 (M.D. Pa. January 25, 2016).

### D. Weight Accorded to Medical Opinions

Plaintiff argues that the ALJ erred in granting:

[P]artial weight to a statement from an unknown source that Plaintiffs respiratory and urinary conditions did not impact her ability to work; partial weight to the [GAF] scores in the mental treatment record; little weight to an assessment from Dr. Stephens that Plaintiff's PTSD would cause significant distress and impairment in social and occupational areas of functioning; little weight to the opinion of non-examining State Agency psychological consultant Roger Fretz, Ph.D.; [and,] little weight to a statement by Dr. Johnson that Plaintiff's PTSD made it difficult for her to maintain employment . . .

Pl. Brief at 10-11.  Plaintiff argues that "[b]ecause the ALJ afforded only little or partial weight to all of the opinion evidence in the record, the ALJ's decision is improperly based on her own lay opinion rather than assessments of the evidence from medically acceptable sources."  Pl. Brief at 11.

An ALJ is entitled generally to credit parts of an opinion without crediting the entire opinion.  *See Thackara v. Colvin*, No. 1:14-CV-00158-GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); *Turner v. Colvin*, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); *Connors v. Astrue*, No. 10-CV-197-PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011).  It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions.  *See e.g.*, *Thackara v. Colvin*, No. 1:14-CV-00158-GBC, 2015 WL 1295956, at *5

(M.D. Pa. Mar. 23, 2015).   Contrary to Plaintiff assertions, this is unlike a case where an ALJ completely rejects all medical opinions, even those which support the ALJ's RFC.   *See e.g.*, *Thanh Tam Vo v. Colvin*, No. 1:14-CV-00541-GBC, 2015 WL 5514981, at *4 (M.D. Pa. Sept. 15, 2015) (remanding where ALJ completely rejected all medical opinions, even the one that supported the ALJ's RFC).

There is a critical difference between cases where an ALJ who finds that a claimant is not disabled when all of the medical opinions indicate that the claimant is disabled and cases where the ALJ assesses the RFC that falls between competing opinions.   Dr. Fretz opined that Plaintiff was not disabled.   Although the ALJ did not afford Dr. Fretz's opinion significant weight because Dr. Fretz's opinion did not account for Plaintiff's temporary exacerbation of symptoms after the death of her child's father, the ALJ considered and assigned some weight to Dr. Fretz's opinion.   *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2011) (ALJ was entitled to rely on state agency opinion, even though ALJ "added restrictions [the physician] did not deem necessary"); *Golubosky v. Comm'r of Soc. Sec.*, No. CIV.A. 3:13-196, 2014 WL 3943029, at *7 (W.D. Pa. Aug. 12, 2014) ("[G]iving Plaintiff the  benefit of the doubt, the ALJ gave Dr. Torio's opinion some weight, but noted that the record supported greater limitations"); *Malfer v. Colvin*, No. CIV.A. 12-169J, 2013 WL 5375775, at *4 (W.D. Pa. Sept. 24, 2013)

("the ALJ properly relied on, and accorded some weight to, Dr. Bryan's physical RFC assessment of plaintiff. As in *Chandler*, the ALJ did not simply rubber stamp Dr. Bryan's opinion. Rather, the ALJ incorporated Dr. Bryan's opinion into the RFC Finding to an extent but gave plaintiff the benefit of doubt by limiting him to sedentary (instead of light) work and including additional restrictions to accommodate his functional limitations.").

The Court can reasonably discern that the ALJ relied on Dr. Fretz's opinion to make the overall determination that Plaintiff was not disabled. Dr. Fretz's opinion was detailed, with significant explanation and occupational limitations. Dr. Fretz reviewed Plaintiff's medical records through June of 2012 from the Lebanon VA Medical Center and from the Lebanon Free Clinic, along with Plaintiff's function report, and work history. (Tr. 98). He noted that Plaintiff was diagnosed with Major Depressive Disorder and PTSD and had been in outpatient psychological treatment since October 2011. (Tr. 100). Dr. Fretz observed that the "treatment notes manifest no evidence of a thought disorder, no evidence of severe dysfunction in any area," "[s]he is capable of self-care/hygiene," "[s]he is able to perform ADLs, able to drive, [and] shop." (Tr. 100). Dr. Fretz noted that although Plaintiff "describes some isolative behavior," she is able "to engage in social settings, [has] no legal difficulties, [and] no [substance abuse] issues." (Tr. 100). Dr. Fretz also observed that although Plaintiff described some difficulty with

concentration, there is no evidence "supporting significant compromise in this area." (Tr. 100). Dr. Fretz opined that Plaintiff had no problems with adaptation and no memory deficits were indicated. (Tr. 100). Thus, Dr. Fretz's opinion was based on a review of a significantly complete case record, including non-medical evidence, contained significant explanation, and accurately characterized the record. (Tr. 98-100). The ALJ did not err by assessing Plaintiff's RFC to be closer to Dr. Fretz's opinion than Dr. Stephens' or Dr. Johnson's opinion.

For the weight accorded to Plaintiff's GAF scores, the ALJ explained that:

The GAF assessments represent a subjective assessment of an area of [Plaintiff's] functioning at a specific time based upon information provided by [Plaintiff], not an objective representation of [Plaintiff's] overall functioning over a longitudinal period of time. . . . to the extent that GAF assessment scores of 53 and above are consistent with a higher level of functioning, they are consistent with the notes of treatment reflecting stabilization and improvement in [Plaintiff's] mental health symptoms, the exacerbation of those symptoms by outside stressors and the improvement of those symptoms after that exacerbation, as well as [Plaintiff's] ability to act as the sole caretaker of her young [child] and household. For these reasons, the GAF assessments are given partial weight.

(Tr. 45). Substantial evidence supports the ALJ's observation that the GAF scores viewed in totality support a finding that Plaintiff's symptoms were exacerbated by the death of her child's father and later improved. *See Thackara v. Colvin*, No. 1:14-CV-00158-GBC, 2015 WL 1295956, at *4 (M.D. Pa. Mar. 23, 2015); *Pendergast v. Colvin*, No. 2:13CV933, 2014 WL 4680730, at *8 (W.D. Pa. Sept.19, 2014); *Gilroy v. Astrue*, 351 F. App'x 714, 715–16 (3d Cir. 2009).

The ALJ also found that Dr. Stephens' December 2012 opinion was:

> Inconsistent with the notes of treatment that documented stabilization of [Plaintiff's] mental health symptoms that were exacerbated by the death of the father of [Plaintiff's child] and had improved as of the date last insured, such that it was noted on November 5, 2012 that [Plaintiff] is doing reasonably well from a mental health standpoint.

(Tr. 45).   On December 31, 2012, Dr. Stephens completed a PTSD disability benefits questionnaire which was not based on examination of Plaintiff, rather based on review of his last assessment and subsequent treatment notes.  (Tr. 449-58).   Dr. Stephens stated that "[b]ased on a review of clinical notes in the VA electronic medical record since the time of examination, I see no reason to alter the opinion rendered on 8/26/11." (Tr. 458).  Dr. Stephens did not address Plaintiff's improvement of symptoms reported by Dr. Johnson.  (Tr. 458).  As noted above, even Plaintiff disagreed with Dr. Johnson's more benign characterization of her symptoms.  *See supra* discussion of (Tr. 73-74, 77-78).   Dr. Stephens was an examining, not treating source.   (Tr. 458).   Substantial evidence supports the weight accorded to Dr. Stephen's opinion.

For Dr. Mulligan's May 2013 opinion from a compensation and pension examination by the Department of Veterans Affairs, while the ALJ was unable to ascertain that the opinion was given by a medical doctor, thus an "acceptable medical source," the ALJ still gave partial weight to Dr. Mulligan's opinions that Plaintiff's respiratory and urinary incontinence conditions did not impact her

ability to work.  (Tr. 45).  The ALJ observed that these opinions were "supported by the lack of evidence of any significant treatment regarding these impairments at or about the alleged disability onset date."  (Tr. 45).  Substantial evidence supports this weight determination.

The ALJ gave little weight to the February 2012 opinion of Plaintiff's treating psychologist, Dr. Johnson indicating that Plaintiff's PTSD symptoms were in the severe range and made it difficult, if not impossible, for her to maintain employment at this time and for the foreseeable future.  (Tr. 46).  The ALJ explained that this opinion was not consistent with the notes demonstrating improvement of symptoms.  (Tr. 46).  The ALJ further observed that the degree of severity of Plaintiff's symptoms was inconsistent with Plaintiff regular gym attendance. (Tr. 46).  Relying on Plaintiff's reported activities of daily living, non-medical evidence is an acceptable reason to assign less weight to Dr. Johnson.  *See* Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936 (ALJ may rely on non-medical evidence which is inconsistent with treating physician's opinion); *Torres v. Barnhart*, 139 F. App'x 411, 414 (3d Cir. 2005) (ALJ permissibly rejected treating opinion "in combination with other evidence of record including Claimant's own testimony"); *Kays v. Colvin*, No. 1:13-CV-02468, 2014 WL 7012758, at *7 (M.D. Pa. Dec. 11, 2014); *Marr v. Colvin*, No. 1:13-cv-2499 (M.D. Pa. April 15, 2015).

## E. RFC limitations for concentration, persistence, and pace

Plaintiff argues that Step 4 and Step 5 were not supported by substantial evidence and that the ALJ erred by not including "any limitations on Plaintiff's ability to perform concentration, persistence, or pace tasks in the RFC."  Pl. Brief at 8.  At step four, the ALJ determined that Plaintiff "was capable of performing past relevant work as a clerk, general" and that such work did not contradict the RFC.  (Tr. 46).  In addition to determining that Plaintiff was capable of performing past relevant work, the ALJ found that with her given RFC, there were additional jobs existing in the national economy that she was able to perform.  (Tr. 47).  For the RFC the ALJ found that Plaintiff:

> [could] perform light work as defined in 20 CFR 404.1567(h) except with normal breaks, with "normal breaks defined as a ten (10) to fifteen (15) minute break midway through the first half of the shift, a similar break midway through the second half of the shift, a twenty (20) to thirty (30) minute break halfway through the shift and one (1) or two (2) five (5) to ten (10) minute unscheduled restroom or drink breaks. [Plaintiff] was capable of occasionally stooping, crouching, squatting and crawling on her hands, knees or feet, but never was capable of climbing ropes, ladders, scaffolding or poles or operating motor vehicles or pieces of large moving equipment as part of the work. [Plaintiff] was required to avoid work around or with hazardous machinery in high exposed places, around large fast moving machinery on the ground, around or with sharp objects and around or with toxic or caustic chemicals. [Plaintiff] retained the capacity for occasional direct interaction as part of the work, but not mere contact, with the general public.

(Tr. 41).  With regard to concentration, persistence or pace, the ALJ found that Plaintiff had "moderate difficulties."  (Tr. 40).  The ALJ explained that:

> While [Plaintiff] alleges that she needed reminders to take her medications and is not good at following instructions, she indicated that she was able to manage her finances (Exhibit 4E). In fact, [Plaintiff] acts as representative payee for the survivor benefits received by her eight (8) year old [child] and acknowledged that she possesses the mental capacity to carry out the duties of this appointment (Testimony). Further, [Plaintiff] is able to use public transportation and drive (Exhibit 4E, Testimony). *At best, the record establishes that [Plaintiff] had moderate limitation in maintaining concentration, persistence or pace*.

(Tr. 40) (emphasis added).   The ALJ also observed that on February 14, 2013, "[Plaintiff's] attention and concentration were observed to be intact, and [Plaintiff's] recent and remote memory were adjudged to be good." (Tr. 44).

"'[G]reat specificity' is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical." *Ramirez v. Barnhart*, 372 F.3d 546, 554-55 (3d Cir. 2004) (internal citations omitted); *see also* SSR 96–8p (requiring a "more detailed assessment" of the claimant's mental limitations at step five of the disability analysis).   In *Ramirez*, the Court held that a limitation to unskilled, simple tasks accommodated for limitations in concentration, but not necessarily pace. *Id.*   The Court explained that a medical expert had specifically testified that the claimant's ability to finish tasks was dependent on her proximity to her children.   *Id.*   In *Ramirez*, the vocational expert testified "that each of the jobs suitable for Ramirez (assembler, packer, and inspector) would have daily production quotas and that Ramirez would have to maintain a certain degree of pace to maintain those jobs." *Id.*   The Court also explained that:

> Of course, there may be a valid explanation for this omission from the ALJ's hypothetical. For example, the ALJ may have concluded that the deficiency in pace was so minimal or negligible that, even though Ramirez "often" suffered from this deficiency, it would not limit her ability to perform simple tasks under a production quota. The record, however, would seem to suggest otherwise.

*Id.* Thus, in *Ramirez*, the record otherwise "suggest[ed]" that an additional limitation related was necessary. *Id.* As another Court in this District has explained:

> Moreover, we find the Third Circuit's decision in *Ramirez* distinguishable from the instant case. In *Ramirez*, the court observed that there may have been a valid explanation for the omission of a more detailed description of the claimant's mental limitation from the ALJ's hypothetical. *Ramirez*, 372 F.3d at 555. The court noted that "the ALJ may have concluded that the deficiency in pace was so minimal or negligible that, even though Ramirez 'often' suffered from this deficiency, it would not limit her ability to perform simple tasks under a production quota," but found that the record seemed to suggest otherwise. *Id.* The instant case presents the opposite situation, the record suggests that even though Plaintiff suffers from a moderate deficiency in the areas of concentration, persistence, and pace, and a mild deficiency in the area of social functioning, these limitations did not effect her ability to function in any discernable fashion during the relevant period.

*Whitmire v. Comm'r of Soc. Sec.*, 3:13-CV-1380, 2014 WL 582781, at *8-9 (M.D. Pa. Feb. 14, 2014) (Kane, J.); *see also Santiago-Rivera v. Barnhart*, CIV.A. 05-5698, 2006 WL 2794189, at *11 (E.D. Pa. Sept. 26, 2006) ("It is true that, in *Ramirez*, the Third Circuit held that greater specificity than a limitation to one to two step simple tasks *may* be necessary in presenting functional limitations caused by a mental impairment in a hypothetical to a VE. However, the *Ramirez* Court

specifically suggested that the case in which more may be required is one in which the Santiago-Rivera had *clearly established in the record* additional, specific deficiencies in concentration, persistence and/or pace that could not be adequately conveyed by a hypothetical limited to simple tasks.")(emphasis in original).  Thus, *Ramirez* does not require automatic remand when a claimant has a moderate limitation in concentration, persistence, and pace.  *Id.*  *Ramirez* requires Plaintiff to additionally establish that the record otherwise suggests that additional limitations were necessary.  *Id.*

Here, Plaintiff merely asserts that, because the ALJ found Plaintiff to have moderate limitation in concentration, persistence, and pace, then the RFC was automatically incomplete.  Plaintiff fails to perform the extra analysis required by *Ramirez* to indicate she had "*clearly established in the record* additional, specific deficiencies in concentration, persistence and/or pace that could not be adequately conveyed" by the hypothetical.  *Id.*  Plaintiff has not identified any medical records documenting impaired concentration and attention.

The Court finds that substantial evidence supports the ALJ's RFC, that the ALJ explained evidence of Plaintiff's ability to manage survivor benefits, is able to drive and take public transportation as examples of her ability to complete tasks.  Dr. Fretz reviewed the medical evidence and concluded it supported no more than a mild limitation in concentration, persistence, and pace.  (Tr. 100).  The ALJ

accounted for Plaintiff's moderate difficulties with "concentration, persistence or pace," by specifying that Plaintiff required a job that allowed up to five breaks during the work day for a total of up to eighty minutes in a work day.

Any error with regard to failing to limit Plaintiff to unskilled or simple work was harmless because the VE identified additional jobs that Plaintiff could perform that were unskilled, such as a small parts assembler, binary machine feeder, a bakery racker, and an electrical accessories assembler.   (Tr. 90-94).   The Dictionary of Occupational Titles ("DOT") indicates that an electrical accessories assembler has a reasoning level of "2" and a standard vocational preparation of "2," which are associated with simple work.  *See* DOT 729-687-010 Assembler, Electrical Accessories I; *Simpson v. Astrue*, CIV.A. 10-2874, 2011 WL 1883124, at *6 (E.D. Pa. May 17, 2011) ("There is a growing consensus within this Circuit and elsewhere that '[w]orking at reasoning level 2 [does] not contradict the mandate that [a claimant's] work be simple, routine, and repetitive.' *Money v. Barnhart,* 91 Fed. App'x 210 (3d Cir.2004).") (internal citations omitted); SSR 00-4P ("The DOT lists a specific vocational preparation (SVP) time for each described occupation.   Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2"); 20 C.F.R. §404.1568 ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.").   Plaintiff fails to show

that the record established limitations that were omitted from the RFC, as required by *Ramirez.*

## F. VE Hypothetical

A question to a vocational expert must reflect "*all* of the claimant's impairments that are supported by the record" to provide substantial evidence. *Allen v. Barnhart*, 417 F.3d 396, 407 (3d Cir. 2005) (emphasis in original). The Third Circuit has explained that "objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself." *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005). Here, Plaintiff challenges the VE testimony because it is premised on an incomplete RFC. Pl. Brief at 14. Where a plaintiff contends that the VE "testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert," such are challenges to the RFC assessment itself. *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005). The Court finds that substantial evidence supports the ALJ's RFC and substantial evidence supports the VE testimony.

## V. Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the

findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after

being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: January 25, 2016                    s/Gerald B. Cohn
                                    **GERALD B. COHN**
                            **UNITED STATES MAGISTRATE JUDGE**